**2023-2117 (lead), -2116**

# United States Court of Appeals for the Federal Circuit

MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., nka Maxell Holdings, Ltd., MAXELL, LTD.,

*Plaintiffs-Appellants,*

– v. –

LG ELECTRONICS INC., LG ELECTRONICS USA, INC.,

*Defendants-Cross-Appellants.*

*On Appeal from the United States District Court for the District of New Jersey in No. 2:15-cv-04431-SRC-CLW Honorable Stanley R. Chesler, Judge*

## CORRECTED NON-CONFIDENTIAL RESPONSE AND REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

JEFFREY B. PLIES
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000
jeffrey.plies@dechert.com

MARTIN J. BLACK
JEFFREY S. EDWARDS
BRIAN M. GOLDBERG
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000
martin.black@dechert.com
jeffrey.edwards@dechert.com
brian.goldberg@dechert.com

*Counsel for Plaintiffs-Appellants*

ORIGINALLY FILED: JANUARY 31, 2024
CORRECTED: MARCH 12, 2024

CP COUNSEL PRESS (800) 4-APPEAL • (323092)

# TABLE OF CONTENTS

**Page**


MONDIS' REPLY TO LG'S RESPONSE TO MONDIS' APPEAL......................1

I. LG MISSTATES THE STANDARD OF REVIEW. ..........................1

II. LG CANNOT SUPPORT THE DISTRICT COURT'S RADICAL APPROACH TO APPORTIONMENT. ...........................2

A. LG FAILED TO REBUT MONDIS' LEGAL AUTHORITIES. ....................................................................3

B. *OMEGA* DID NOT ALTER THE HOLDINGS OF *VECTURA*, *BIO-RAD* OR *ELBIT SYSTEMS*.............................6

C. LG DOES NOT AND CANNOT ADDRESS THE POLICY IMPLICATIONS OF ADOPTING THE DISTRICT COURT'S APPROACH. ......................................10

D. LG CANNOT DEFEND, AND INDEED INSTIGATED, THE DISTRICT COURT'S PREOCCUPATION WITH THE HYPOTHETICAL ASSERTION AGAINST LG OF *OTHER* FAMILY PATENTS...........................................11

E. THE ENTIRE MARKET VALUE RULE IS NOT IMPLICATED BECAUSE THE REFERENCE LICENSES WERE BASED ON THE PRODUCT PRICE. .........................................................................14

F. WHEN VIEWED IN LIGHT OF THE PROPER LEGAL PRINCIPLES, THE JURY'S VERDICT WAS BASED ON SUBSTANTIAL EVIDENCE. ........................................16

III. LG FAILS TO JUSTIFY THE DISTRICT COURT'S ERRONEOUS ANALYSES OF (A) ITS "NO NEW EVIDENCE" RULE, (B) § 285 EXCEPTIONALISM, (C) ENHANCEMENT AND (D) INTEREST. ........................................20

A. THE DISTRICT COURT'S "NO NEW EVIDENCE" RULE WAS ERRONEOUS. ....20

B. THE DISTRICT COURT'S § 285 EXCEPTIONALISM ANALYSIS WAS ERRONEOUS. ....23

C. THE DISTRICT COURT'S ENHANCEMENT ANALYSIS WAS ERRONEOUS. ....23

D. THE DISTRICT COURT'S PREJUDGMENT INTEREST ANALYSIS WAS ERRONEOUS. ....25

RESPONSIVE ARGUMENT TO LG'S CROSS-APPEAL ....27

COUNTER-STATEMENT OF LG CROSS-APPEAL ISSUES ....27

COUNTER-STATEMENT OF LG'S CROSS-APPEAL CASE AND FACTS ....27

SUMMARY OF THE ARGUMENT ....28

I. STANDARD OF REVIEW. ....29

II. THE DISTRICT COURT DID NOT ERR IN DENYING LG'S MOTION FOR JMOL ON WRITTEN DESCRIPTION. ....30

A. THE WRITTEN DESCRIPTION STANDARD. ....30

B. THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT THE VERDICT OF NO INVALIDITY WAS SUPPORTED BY THE RECORD. ....33

1. THE WRITTEN DESCRIPTION RECORD. ....34

C. THE JURY WAS FREE TO DISMISS DR. STEVENSON'S ULTIMATE CONCLUSION ON WRITTEN DESCRIPTION FOR LACK OF CREDIBILITY. ....38

D. THERE WAS ADDITIONAL SUBSTANTIAL EVIDENCE SUPPORTING THE JURY'S FINDING ON VALIDITY. ....43

1. THE SPECIFICATION PROVIDES SUBSTANTIAL EVIDENCE OF WRITTEN DESCRIPTION SUPPORT BY USING DISPLAY IDS AS TYPE IDS. ....................................................44

2. THE PROSECUTION HISTORY DEMONSTRATES THAT THE TYPE ID WAS PROPERLY ADDED. .................................................47

III. THE JURY PROPERLY FOUND INFRINGEMENT GIVEN THE EVIDENCE OF A COMMUNICATION CONTROLLER.........................................................................48

A. MR. LAMM'S OPINION WAS WELL-SUPPORTED BY LG'S IMPLEMENTATION OF THE VESA E-DDC STANDARD. ........................................................................48

B. THE JURY FOUND MR. LAMM TO BE MORE CREDIBLE THAN DR. STEVENSON. .................................51

C. THE EEPROM DATASHEET CORROBORATED MR. LAMM. .........................................................................52

D. THE JURY COULD HAVE FOUND A COMMUNICATION CONTROLLER BASED UPON DR. STEVENSON'S OWN ADMISSIONS. ..........................55

IV. THE DISTRICT COURT DID NOT ERR IN DENYING LG'S MOTION TO VACATE THE RETRIAL $14.3 MILLION DAMAGES AWARD. ..................................................................57

A. THERE IS NO ERROR IN THE DISTRICT COURT'S CONCLUSION THAT THE JURY COULD HAVE AWARDED $14.3 MILLION. ..............................................58

B. THE RECORD CONTAINED SUFFICIENT EVIDENCE TO SUPPORT AN UNCERTAINTY ADJUSTMENT. ..................................................................60

1. THERE IS LEGAL SUPPORT FOR AN UNCERTAINTY ADJUSTMENT. ..............................61

2. THERE IS RECORD SUPPORT FOR AN UNCERTAINTY ADJUSTMENT. ....63

CONCLUSION ....66

CERTIFICATE OF SERVICE ....68

CERTIFICATE OF COMPLIANCE ....69

CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief is subject to a protective order. The confidential information on pages 2, 4, 7, 9, 17, 26, 59 and 64 relates to Hitachi's and Mondis' confidential license agreements with the Defendants-Cross Appellants and third parties, including the confidential terms of such licenses, the number of licenses, and the identity of a third party licensee, which has been designated as confidential.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Techs., Inc. v. Novell Sys., Inc.*,
155 F.3d 567 (Fed. Cir. 1998) ....................45

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................4

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ....................30

*Amsted Indus., Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 178 (Fed. Cir. 1994) ....................42

*Apple Inc. v. Samsung Electrs. Co Ltd.*, Case No. 11-CV-01846-LHK,
2016 WL 777924 (N.D. Cal. Feb. 29, 2016) ....................22

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
147 F.3d 1374 (Fed. Cir. 1998) ....................41

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ....................58

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ....................30, 31

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ....................*passim*

*Biogen MA Inc. v. EMD Serono, Inc.*,
976 F.3d 1326 (Fed. Cir. 2020) ....................1, 2

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ....................31

*Boston Scientific Corp. v. Johnson & Johnson*,
647 F.3d 1353 (Fed. Cir. 2011) ....................46

*Brigham & Women's Hosp., Inc. v. Perrigo Co.*,
761 F. App'x 995 (Fed. Cir. 2019) ....................50

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*,
636 F.3d 1341 (Fed. Cir. 2011) ....................................................................31

*Cephalon, Inc. v. Watson Pharm., Inc.*,
707 F.3d 1330 (Fed. Cir. 2013) ....................................................................33

*Comark Commc'ns, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ....................................................................42

*Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech., Inc.*,
542 F.3d 1363 (Fed. Cir. 2008) ....................................................................47

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ....................................................................14

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) ....................................................................51

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ....................................................................26

*E.I. Du Pont De Nemours & Co. v. Unifax I LLC*,
921 F.3d 1060 (Fed. Cir. 2019) ....................................................................38

*Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.*,
927 F.3d 1292 (Fed. Cir. 2019) ..............................................................*passim*

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. 2014)..................................................................12, 16

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ....................................................................64

*Gay v. Petsock*,
917 F.2d 768 (3rd Cir. 1990) ...............................................................28, 30

*Gen. Motors Corp. v. Devex Corp.*,
461 U.S. 648 (1983).......................................................................................26

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp 1116 (S.D.N.Y. 1970) ........................................................*passim*

*Habecker v. Clark Equip. Co.*,
36 F.3d 278 (3d Cir. 1992) ..........................................................................22

*Habecker v. Clark Equip. Co.*,
797 F. Supp. 381 (M.D. Pa. 1992)................................................................22

*Halo Electr., Inc. v. Pulse Electr., Inc.*,
579 U.S. 93 (2016)........................................................................................25

*Hologic, Inc. v. Smith & Nephew, Inc.*,
884 F.3d 1357 (Fed. Cir. 2018) ....................................................................46

*In re Driscoll*,
562 F.2d 1245 (CCPA 1977) ........................................................................32

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (2020)......................................................................................46

*Indivior UK Ltd. v. Dr. Reddy's Labs. S.A.*,
18 F.4th 1323 (Fed. Cir. 2023) .....................................................................32

*Inphi Corp. v. Netlist, Inc.*,
805 F.3d 1350 (Fed. Cir. 2015) ....................................................................45

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
496 F.3d 1334 (Fed. Cir. 2007) ..............................................................42, 43

*Jurgens v. CBK, Ltd.*,
80 F.3d 1566 (Fed. Cir. 1996) ......................................................................24

*Kaufman v. Microsoft Corp.*,
34 F.4d 1360 (Fed. Cir. 2022) ......................................................................26

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................................................12

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) ........................................................................31

*Lucent Tech, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ..................................................................38, 61

*Moba, B.V. v. Diamond Automation, Inc.*,
325 F.3d 1306 (Fed. Cir. 2003) ........................................................................38

*Novozymes A/S v. DuPont Nutrition Biosciences APC*,
723 F.3d 1336 (Fed Cir. 2013) ..........................................................................31

*Nuvo Pharm. (Ireland) Designated Activity Co., Dr. Reddy's Labs. Inc.*,
923 F.3d 1368 (Fed. Cir. 2019) ........................................................................42

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ...................................................................*passim*

*Orthokinetics v. Safety Travel Chairs*,
806 F.2d 1565 (Fed. Cir. 1986) ........................................................................32

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ..................................................................32, 33

*Prism Techs LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017) ............................................................61, 62, 65

*Promega Corp. v. Life Technologies Corp.*,
875 F.3d 651 (Fed. Cir. 2017) ..........................................................................21

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992) ..........................................................................24

*Rexnord Indus., LLC v. Kappos*,
705 F.3d 1347 (Fed. Cir. 2013) ........................................................................46

*Riseman v. Advanta Corp.*,
39 Fed. Appx. 761 (3d Cir. 2002)......................................................................58

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
637 F.3d 1269 (Fed. Cir. 2011) ....................65

*SiOnyx LLC v. Hamamatsu K.K.*,
981 F.3d 1339 (Fed. Cir. 2020) ....................23

*Sisvel Int'l S.A. v. Sierra Wireless, Inc.*,
No. 2022-1387, 2022-1492, 2023 WL 5659063 (Fed. Cir. Sept. 1, 2023) ....................21

*Spectralytics, Inc. v. Cordis Corp.*,
649 F.3d 1336 (Fed. Cir. 2011) ....................24, 61

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) ....................58

*St. Jude Med., Inc. v. Access Closure, Inc.*,
729 F.3d 1369 (Fed. Cir. 2013) ....................33

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
665 F.3d 1269 (Fed. Cir. 2012) ....................30

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
862 F.2d 1564 (Fed. Cir. 1988) ....................25

*Unisplay, S.A. v. Am. Elect. Sign Co., Inc.*,
69 F.3d 512 (Fed. Cir. 1995) ....................58

*Univ. of Rochester v. G.D. Searle & Co.*,
358 F.3d 916 (Fed. Cir. 2004) ....................31, 32

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991) ....................32

*Vectura Ltd. v. Glaxosmithkline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) ....................*passim*

*Vectura ltd. v. GlaxoSmithKline LLC*,
No. 16-638-RGA, 2019 WL 1352767 (D. Del. Mar. 26, 2019) ....................4

*Waldorf v. Shuta*,
896 F.2d 723 (3d Cir. 1990) ....................1

*WhitServe, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ....................64

**Statutes**

35 U.S.C. § 282 ....................32

35 U.S.C. § 284 ....................10, 66

35 U.S.C. § 285 ....................20, 23, 66

**Other Authorities**

Federal Rule of Evidence 401 ....................62

Federal Rule of Evidence 402 ....................21

**MONDIS' REPLY TO LG'S RESPONSE TO MONDIS' APPEAL**

LG asks this Court to defer to the district court's discretion, but because that discretion rests on legal error, review here is plenary. The district court applied the wrong law of apportionment, first by requiring Mondis to reduce the family rate for the patent-in-suit and second by punishing Mondis for not accounting for the *in terrorem* effect of unasserted patents. In its responsive brief, LG dismisses the numerous cases stating that license comparability creates a question of fact, resting the bulk of its response on an overly expansive reading of the majority decision in *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021). LG does not candidly address the substantial differences between the record below and in *Omega*, let alone the policy implications of its position. And on the *in terrorem* effect of unasserted patents, LG now concedes that the hypothetical negotiation must only include the patent-in-suit.

## I. LG MISSTATES THE STANDARD OF REVIEW.

LG contends that the district court's new trial grant should be reviewed for abuse of discretion (LG Br. at 52-54), but it is well established that where, as here, a ruling was made under a legal misapprehension, reversal is appropriate. *See, e.g.*, *Waldorf v. Shuta*, 896 F.2d 723, 737 (3d Cir. 1990) (applying plenary review to reverse new trial denial where gravamen was "essentially a claim that the evidence was legally insufficient to sustain the verdict"); *see also Biogen MA Inc.*

*v. EMD Serono, Inc.*, 976 F.3d 1326, 1331, 1336 (Fed. Cir. 2020) (applying Third Circuit's plenary review standard to reverse conditional new trial grant based on same "legal errors" in court's JMOL grant).

The district court's decision rests on legal propositions that Mondis appeals and without them, the decision cannot stand. The court characterized two of LG's new trial grounds as: "1) Plaintiff's damages theory violates the apportionment requirement; 2) Plaintiff's threshold theory violates Federal Circuit law." Appx230 (D.E. 558 at 11). These rulings conflict with this Court's jurisprudence, and therefore, this Court's review is plenary. LG's assertion that Mondis erroneously used the JMOL standard (LG Br. at 53) is inaccurate.

## II. LG CANNOT SUPPORT THE DISTRICT COURT'S RADICAL APPROACH TO APPORTIONMENT.

The district court ruled as a matter of law that a small family of patents on the same specification cannot have the same value as a family member asserted on its own. It did so in the face of dozens of agreements between the patentee and licensees that were based on threshold pricing, many of which expressly required the payment of the [redacted] so long as [redacted] was [redacted] and [redacted]. The district court rejected testimony of both Mondis' lead negotiator and damages expert that this was common, mutual industry practice. In doing so,

the court turned a disputed question of fact into a question of law. LG has been unable to muster any legal support for its position, other than misreading the *Omega* decision, and ignoring the relevant policy implications. The district court's new trial grant was predicated on legal error and should be reversed.

### A. LG Failed to Rebut Mondis' Legal Authorities.

The district court's approach to apportionment is in direct conflict with both commercial reality and this Court's decisions in *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030 (Fed. Cir. 2020) and *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353 (Fed. Cir. 2020), both following *Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.*, 927 F.3d 1292 (Fed. Cir. 2019).

LG brushes aside these precedents, but they decisively address the issue presented. As here, the expert in *Vectura* discussed the differences in the number of patents between the comparable license and the hypothetical negotiation. This Court held that "the fact that other patents were included in the 2010 license does not fatally undermine [the expert's] theory of comparability." 981 F.3d at 1041. In *Bio-Rad*, this Court upheld a damages award for three patents-in-suit that was supported by rates in two comparable licenses for similar technology, including one for more than 500 patents. 967 F.3d at 1375-76. In *Elbit*, this Court upheld a damages award for a single patent that was supported by the full rate from a license

for multiple patents that were technologically comparable to the patent-in-suit, but not in the same patent family. 927 F.3d at 1300-01. In all these cases, this Court approved analyses in which reference licenses were used even though they included more patents and families than the patents-in-suit alone, and left it to expert and percipient evidence and ultimately the jury to decide whether and to what extent adjustment was appropriate in the factual context of the case. *Bio-Rad*, 967 F.3d at 1374 (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)) ("The 'degree of comparability' was appropriately left for the jury to decide.").

LG says that the *Vectura* reference license had "built-in apportionment," but there was none here because the Mondis reference licenses were not for the '180 patent alone. But the 400+ patent reference license in *Vectura* did not even license that patent-in-suit, which was mentioned only in a licensing *option* provision that the defendant-licensee declined. 981 F.3d at 1039-1040; *Vectura ltd. v. GlaxoSmithKline* LLC, No. 16-638-RGA, 2019 WL 1352767, at *1 (D. Del. Mar. 26, 2019). If apportionment for that patent-in-suit was "built-in" to the *Vectura* license, it was perforce built into the many Mondis licenses that require payment of the [redacted] "License Term" if even one [redacted] "License Term" from the [redacted] "License Term" alone [redacted] "License Term". LG says that in *Bio-Rad*, the defendant did not dispute that liability for the remaining patent would

support the full award, but the principle applies whether the defendant resisted the plaintiff's contentions or not: either way, the issue is for the jury. LG says that the *Elbit* expert accounted for relevant differences between the reference and hypothetical negotiation licenses while Mondis' expert did not because he relied on threshold licensing, but that is the question to be answered. In both *Bio-Rad* and here, the experts considered the evidence of other licenses and declined to reduce the rate per se for a group of patents simply because fewer patents were actually in litigation.

The crucial point is that in all of these cases, reference license rates were considered, and the technical differences between the asserted and unasserted patents were addressed. That the licenses included more patents and families than the patents-in-suit alone was not a legal bar to the expert using the contract rate in the damages analysis. The extent of comparability and impact on the hypothetical negotiation was for the jury to decide. The district court here erred by turning that question of fact into a legal rule requiring Mondis to reduce the family rate because it was asserting a single family member in the litigation.

### B. *Omega* Did Not Alter the Holdings of *Vectura*, *Bio-Rad* or *Elbit Systems*.

Instead of confronting the principles of *Vectura*, *Bio-Rad* and *Elbit Systems*, LG relies on this Court's decision in *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021). LG Br. at 60-61. LG equates Mondis' apportionment approach with *Omega*'s rejected approach, but the corpus of licensing and technical evidence in the cases differ dramatically. The *Omega* decision turned on its facts and did not hold that a patentee is *required as a matter of law* to charge less for a key patent than for a small family issuing off the same specification. Nor did the decision address, much less hold, that a patent's potential blocking nature outside the hypothetical negotiation must count against the patentee in that negotiation.

The licensing evidence referred to in the majority decision in *Omega* contrasts sharply with the carefully constructed theory presented below. In *Omega*, the plaintiff relied on 18 licenses, only two of which this Court noted as potentially relevant because they included a patent-in-suit. *Omega Patents*, 13 F.4th at 1380. Those two licenses included dozens of patents, most of no familial

relationship at all to the patents-in-suit.[1] The decision did not reject reliance even on the 18 licenses as a matter of law, but criticized the expert's opinion for "glaringly" failing to provide any technical or other analysis distinguishing the value of the asserted patents from the other licensed patents. *Id.* at 1380-81. The expert "simply testified that the licenses 'cover multiple patents that are even beyond the patents in the hypothetical negotiation,' J.A. 23571, and that the licenses contain a 'long list of patents,' J.A. 23586." *Id.* at 1381. The patentee tried to fill the technical gap by arguing that it had a $5 licensing policy for patents in the same general field and needed to go no further to apportion. *Id.* The majority concluded that this was too thin a reed on which to rest a damages case. *Id.* at 1381-82. The dissent argued that the majority decision was too restrictive. *Id.* at 1382-86.

Compare the facts in *Omega* to those presented to the district court here: Mondis began with a set of [redacted] agreements, all of which included the '180 patent. Appx20965 (Spiro Tr. 965:6-25). One license was between Mondis and LG

[1] The two licenses can be found at *Omega Patents, LLC v. CalAmp Corp.*, Case No. 2020-1793 (Fed. Cir.): Cimble license (Appx22195-22204 at Appx22203-22204); Accele license (Appx22227-22236 at Appx22235-22236). The priority information on the face of the patents and applications, which is a matter of public record, shows that there were numerous patents in each license that had no familial relationship with the patents-in-suit or each other.

themselves. Their experts agreed that where the licenses covered computer monitors (or monitors plus televisions), their value was attributable to two patent families, the DDC/2B family[2] and the DDC/CI family[3], and where the licenses covered only televisions, only the DDC/2B rate applied. Appx21078-21081 (Bratic Tr. 1078:8-24, 1079:14-21, 1080:19-1081:1), Appx21088 (Bratic Tr. 1088:10-20); Appx21199:7-9 (Hansen Tr. 1199:7-9), Appx21194-21195 (Hansen Tr. 1194:23-1195:2), Appx30162 (Hansen Tr. 162:4-6). Rather than adopt the full rate in the agreements and argue that LG should simply pay that rate in this television case, Mondis apportioned out 75% of the value of the license to account for the non-asserted patent family. Appx21080-21081 (Bratic Tr. 1080:19-1081:1). LG's expert agreed with that apportionment. Appx21198-21199 (Hansen Tr. 1198:11-1199:9).

At that point, Mondis had apportioned down to the patent-in-suit and a few family members issuing off the same specification. Mondis then provided a technical comparison between the family members, all of which claimed different aspects of the same invention disclosed in the specification. Mondis' technical

[2] Also called the '090 patent family. Appx20999 (Spiro Tr. 999:3-5).

[3] Also called the '812 patent family. Appx21193 (Hansen Tr. 1193:6-14).

expert testified at trial that the ’180 patent was the most important in the family, and his testimony was uncontradicted. Appx21036-21041 (Lamm Tr. 1036:6-1039:3, 1040:23-1041:8). Mondis’ license negotiator testified that licensees normally refused to pay more for further family patents, its damages expert testified this was common practice, and neither were contradicted. Appx20966-20967 (Spiro Tr. 966:7-967:9); Appx21075 (Bratic Tr. 1075:7-14). LG brought no witness to challenge Mondis’ account of the negotiation of the prior Mondis/LG license on this point (or any other).

Moreover, LG repeatedly states that Mondis did not have a prior license that apportioned strictly to the ’180 patent, but even that was untrue. The Hon Hai license royalty was a per-unit amount representing a 0.25% rate. Appx15192 (§ 1.11); Appx21000-21001 (Spiro Tr. 1000:20-1001:5); Appx21079-21080 (Bratic Tr. 1079:15-1080:1). The license provided that if [redacted] of the [redacted] [redacted] were the [redacted] to [redacted] that [redacted] was [redacted] Appx15194-15195 (§ 4.4).

None of this evidence was present in *Omega*, where (1) the vast majority of licenses did not include all patents-in-suit; (2) every license included many patent families; (3) most of the unasserted licensed patents did not issue off the same specification as the asserted patents; (4) there was little or no technical evidence

about what the unasserted licensed patents covered; and (5) the patentee did not even try to account for the value of the asserted vis-à-vis unasserted licensed patents, relying solely on a unilateral rack rate for the license.. *Omega* is simply a different case, with a very different set of facts. The *Omega* decision did not purport to overrule *Vectura*, *Bio-Rad* and *Elbit,* and did not create a new rule for license apportionment of patent family members. *Vectura*, *Bio-Rad* and *Elbit* provide the rule of decision here.

### C. LG Does Not and Cannot Address the Policy Implications of Adopting the District Court's Approach.

As Mondis pointed out in its opening brief, the policy implications of adopting the district court's approach to apportionment would be sweeping. Mondis Br. at 45-46. It is routine for parties to license family members together and routine for a smaller subset of patents and claims to be presented at trial. To approve a new rule of apportionment for claims issued off the same specification would result in artificial and unwieldy litigation. It would also force patentees to keep duplicative patents in litigation all the way through trial, lest the defendant argue that by dropping a patent, the patentee must then reduce its damages request.

Congress sought to approximate a market rate when it passed 35 U.S.C. § 284, which requires courts to award at least a "reasonable royalty" to aggrieved

patentees. The district court's approach prohibits use of these market principles. Patent claims issued off the same specification, whether in one patent or divided between two or more, are almost always licensed together. That is because what the licensee purchases is freedom to operate from the invention disclosed in the specification. The patentee cannot charge more than once for use of the invention, and licensees are unwilling to pay more than once for freedom to operate. The patent counting approach, which seeks to divide the unitary consideration exchanged between the parties without regard to underlying value assessment, is fundamentally at odds with the real world of licensing. This Court's apportionment jurisprudence should mirror commercial reality, not confound it. It is error to prohibit the patentee from even arguing that truth.

### D. LG Cannot Defend, and Indeed Instigated, the District Court's Preoccupation With the Hypothetical Assertion Against LG of *Other* Family Patents.

The district court also vacated the jury's verdict on the further ground that it would have allowed Mondis to lie in wait with *other* family patents to attack LG again after the '180 hypothetical negotiation had concluded, which it held no reasonable jury could countenance:

> No reasonable jury could accept this proposition, that a business would willingly agree to pay the threshold rate but receive nothing usable in return. And, indeed, why

> would any business pay anything for a license that did not allow that business to make and sell its product? If there are four patents that are essential to the DDC2B standard, of what value is a license to only one of the four?" Appx236.

Appx236. Mondis showed in its opening brief this was error: the hypothetical negotiation is limited to asserted patents. Mondis Br. at 46, 48.

LG does not try to defend this position and cites no authority for the proposition that a licensor's potential *in terrorem* assertion of unasserted patents must be considered in the *Georgia-Pacific* hypothetical negotiation. To the contrary, importing a licensor's other, unasserted patents would violate the premise of the *Georgia-Pacific* construct. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) ("the purpose of the hypothetical negotiation framework … seeks to discern the value of the *patented technology* to the parties in the marketplace when infringement began") (emphasis added).

LG now agrees on appeal that "the hypothetical negotiation is limited to the asserted patent." LG Br. at 63. LG says other patents are still relevant but the reference licenses need a comparability adjustment per *Ericsson Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). That is a diversion. The issue here is not comparability but whether a patentee's potential *in terrorem* assertion of *other* patents must be included. That is what preoccupied the district court.

LG led the district court into this fundamental error. LG argued to the jury and then the district court that additional family patents rendered a license to just the ’180 patent worthless. Appx21253 (LG Closing Tr. 1253:10-16)[4]; Appx1505) (“Plaintiffs improperly seek to saddle LG with an inflated ‘freedom to operate’ price mostly covering unasserted patents, even though LG would not receive a license to (and thus could be sued on) these other patents in the hypothetical negotiation.”). The district court then took up the argument, holding that “[n]o reasonable jury could accept this proposition, that a business would willingly agree to pay the threshold rate but receive nothing usable in return.” Appx236, *op cit*.

Now LG runs from the argument. There is no support for the proposition that a patentee should be penalized because it holds other blocking patents. That is particularly true here where the patentee testified that it would have licensed the additional patents for no charge. Appx20966 (Spiro Tr. 966:7-18); and the ’180 patent was terminally disclaimed over other family members. Appx1313-1317.

---

[4] “So what they want you to believe, they want you to believe that we're going to pay not only .25 percent for the one patent, we're going to pay .75 percent for the one patent, and then the very next day they can go and sue us on the other patents. On a Tuesday, sue us on one of them. On a Wednesday, sue us on another one.” Appx21253 (LG Closing Tr. 1253:10-16).

LG created a false narrative below, succeeded in getting the district court to buy into it and nullify the jury's determination. That was error, and this Court should reinstate the verdict.

**E. The Entire Market Value Rule is Not Implicated Because the Reference Licenses Were Based on the Product Price.**

It is undisputed that patent damages are often calculated using a combination of a royalty rate and royalty base that reflect, or are "apportioned" to, the patented features alone. When this rate/base combination was negotiated in licenses that are comparable to the hypothetical negotiation license, apportionment is said to be "built-in" or "baked in." *Vectura*, 981 F.3d at 1041 ("Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent"); *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015).

Here, there were abundant reference licenses, including the monitor license between the parties themselves (as in *Vectura*), for which there was sufficient evidence for the jury to find comparability. That royalty rate applied in combination with the royalty base of the reference licenses, namely, the net sale price of complete television and monitor products licensed. Even LG's expert, Mr.

Hansen, used LG complete products as the royalty base in one aspect of his opinion on the amount of damages due. Appx21187 (Hansen Tr. 1187:1-8). Further royalty base apportionment in these circumstances is not required. The royalty rate and royalty base combination in the reference licenses reflects the value of the patent.

LG now contends that Mondis "violat[ed] the entire market value rule," and asserts that is an independent ground for vacating the jury verdict. LG Br. at 64-66. LG relies on the district court's dicta that "Mondis may have placed undue emphasis on the value of the entire product," and LG asserts that Mondis "did not challenge the [damages retrial order]" on entire market value (EMV) grounds. LG Br. at 64-66. LG is wrong on both fronts. The district court approved of both parties' and their experts' use of the complete accused televisions as the royalty base. The court allowed the parties to refer to the product price at the second trial as well and rejected LG's similar post-trial EMV challenge there, so it is plain that the district court did not consider that aspect of the first trial to have been error, much less a sufficient support to overturn the verdict. Appx536, Appx539-540.

The district court's EMV observations were peripheral and non-dispositive, and there was no duty to "challenge" them. Nor were they substantively valid. The reference licenses, including the Mondis/LG monitor license, used *complete*

product prices as the royalty base. So did LG's expert, Mr. Hansen, in calculating the amount of damages he thought due. Appx21217-21218 (Hansen Tr. 1217:25-1218:6). Further royalty base apportionment on EMV grounds in these circumstances is neither required nor appropriate. *Ericsson*, 773 F.3d at 1227-28 (holding that entire market value rule was not violated by apportioning a royalty base through comparable licenses that set royalties by reference to an end product).

Here, the evidence of commercial practice was overwhelming. Indeed, an addendum to the Mondis/LG monitor license stated that the actual license between the parties had been negotiated based on the price of the complete product. Appx15062. This evidence was admitted without objection by LG and was before the jury. The district court did not hold, and could not logically have held, that the parties to an actual negotiation for the same technology who explicitly used the entire product price as the royalty base in a prior license were barred from doing so in this case, at all and still less without any supporting evidence.

### F. When Viewed in Light of the Proper Legal Principles, the Jury's Verdict Was Based on Substantial Evidence.

The reference licenses covered the Hitachi/Mondis "Plug and Play" patents, comprised of patents in two related patent families: the DDC/CI family and the DDC/2B family. Appx20108-20109 (Spiro Tr. 108:14-109:13). The '180 patent is

in the DDC/2B family. Appx20109 (Spiro Tr. 109:14-15). It was common ground that monitors were covered by both families, while televisions were covered by the DDC/2B family alone. Appx20970 (Spiro Tr. 970:3-14). It was also common ground that the normal rate under the Hitachi and Mondis licenses for both families was 1% of the net sale price of licensees' entire final products, and for the DDC/2B family alone was 0.25% of the net sale price of licensees' entire final televisions. Appx20965 (Spiro Tr. 965:9-15); Appx20967-20968 (Spiro Tr. 967:21-968:13).

Both sides' damages expert performed a step-by-step apportionment of licenses for the jury, working from the full license rate down to what they said was the value for the '180 patent. For example, for the Mondis-LG monitor agreement that both experts opined was the most important, and because this case concerned televisions alone, both experts apportioned the rate from [redacted] to the 0.25% DDC/2B rate.[5] The experts differed on the issue of *further* apportionment. LG's expert (Mr. Hansen) evenly divided the (already apportioned) 0.25% rate by the raw number of DDC/2B family patents he saw as most valuable, regardless of the

[5] Appx21198-21199 (Hansen Tr. 198:11-199:9) (LG monitor agreement); Appx21214 (Hansen Tr. 1214:3-14) (excess sales price).

different claims and values of each.[6] Mondis' expert (Mr. Bratic) rejected raw patent counting as arbitrary. He relied on Mr. Lamm's opinions that the '180 patent was the preeminent patent in the DDC/2B family for televisions was more important for LG's televisions than its monitors, and also on Mr. Spiro's testimony, and his own real-world experience, that licensees in these circumstances would insist, and Mondis would agree, that having paid the 0.25% for the '180 patent, no more would be paid for any other DDC/2B patents.[7] Apparently, the jury preferred Mr. Bratic's approach to Mr. Hansen's.

LG denies that the '180 patent has any value greater than any other family patent. But Mr. Lamm testified that the '180 patent had preeminent importance among its family members for televisions (Appx21025-21028 (Lamm Tr. 1025:22-1028:4); Appx21033-21035 (Lamm Tr. 1033:2-1035:7)). Of all family patents, only the '180 enabled automatic television picture configuration. Appx21036-21039 (Lamm Tr. 1036:6-1039:3); Appx21040-21041 (Lamm Tr. 1040:23-

---

[6] Appx21198-22000 (Hansen Tr. 1198:11-1199:9, 1199:19-1200:6) (regarding LG monitor agreement). Although LG's opening brief describes the DDC/2B family as having eight patents (LG Br. at 8, 42, 55 and 57), LG's damages expert, Mr. Hansen, testified that only six were asserted in litigation and therefore had relevance to a damages analysis. Appx21195-21196 (Hansen Tr. 1195:11-1196:15).

[7] Appx21092-21097 (Bratic Tr. 1092:25-1097:16).

1041:8). LG quibbles that Mr. Lamm testified that the ’180 patent was the “heart” of the DDC/2B family because additional patents also provided foundational technology for Plug-N-Play. LG Br. at 56 fn. 8. This is sophistry. That *other* family members contributed to Plug-N-Play does not detract from the comparative superiority of the ’180 for LG’s televisions. The jury observed the direct and cross-examination of Mr. Lamm; LG made its submissions along these lines to the jury; and the jury was entitled to credit Mr. Lamm’s testimony as it thought fit. The jury will have made what further adjustment (if any) it considered appropriate to achieve technological comparability.

As to commercial comparability, LG’s claim is that the 0.25% rate in reference licenses is for all family patents and not for the ’180 patent alone, so the value of the ’180 patent must perforce be less than for the full family. LG Br. at 56. This is mere repetition of the district court’s error. To the contrary, the jury heard at length from Mr. Spiro that the negotiators of the reference licenses, including the Mondis/LG Monitor License, based their negotiation on the best single patent, and the others came with it for no further payment (Appx20966 (Spiro Tr. 966:10-18)); and that this was “very practical” for both parties because of the long time and cost the negotiation process required, and because reference licensees abhorred double-dipping: “You get paid once and they want peace.”

Appx20966-20967 (Spiro Tr. 966:25-967:9). The terms of the reference licenses supported this. The jury also heard from Mr. Bratic that this form of licensing was common in his own experience of negotiating and reviewing patent licenses (Appx21074-21077 (Bratic Tr. 1074:18-1075:14, 1075:15-1077:6)). LG cross-examined Messrs. Spiro and Bratic vigorously. LG did not call any LG negotiator or other executive to support its assertions. The jury heard the evidence and was entitled to decide as it did.

## III. LG FAILS TO JUSTIFY THE DISTRICT COURT'S ERRONEOUS ANALYSES OF (A) ITS "NO NEW EVIDENCE" RULE, (B) § 285 EXCEPTIONALISM, (C) ENHANCEMENT AND (D) INTEREST.

The district court erred in its rulings on enhanced damages, fees and interest, all of which were founded on legal error, as well as the district court's incorrect view of the damages law. This Court should also reverse the "no new evidence" ruling in relation to any further proceedings on damages below.

### A. The District Court's "No New Evidence" Rule Was Erroneous.

In its opening brief, Mondis explained that the district court erred in excluding relevant evidence at the retrial. After the original jury verdict, the district court did an about-face on its pre-trial *Daubert* rulings, fundamentally altering the relevant legal landscape on which Mondis had constructed its trial strategy. It ordered a retrial but strictly barred Mondis from adjusting its strategy

based on the new legal landscape by imposing a "no new evidence" rule. The rule was manifestly unfair, violated Federal Rule of Evidence 402, and by extension Mondis' right to a fair jury trial under the Seventh and Fourteenth Amendments. Mondis Br. at 49-52 and *passim*.

LG's response did not address *Sisvel*[8] or Federal Rule of Evidence 402. Instead, LG referred to the parties' briefing on an unrelated issue raised earlier by the district court concerning *Promega Corp. v. Life Technologies Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017), which the court later rejected as inapposite. LG now argues that to avoid a *Promega* waiver, Mondis relied on the extensive body of evidence at the first trial that could support a reasonable royalty, and that Mondis should be strictly held to that reliance. What actually happened is that Mondis pointed out that there was substantial evidence in the record to support an award of damages, including the opinion of LG's expert. As a result, there was no basis to grant JMOL. Appx6202. Nor was there any basis to conclude that Mondis had waived its right to a retrial. The district court agreed that *Promega* was irrelevant (Appx256) but ruled that the new trial would be limited to evidence previously

---

[8] Mondis Br. at 49, citing *Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, No. 2022-1387, 2022-1492, 2023 WL 5659063, at *4 (Fed. Cir. Sept. 1, 2023) ("Legal error constitutes an abuse of discretion.").

admitted at the first trial. Appx263. Other evidence was barred, including new testimony from previously disclosed witnesses or new documents from the original pretrial order exhibit list.

In LG's world, the district court's "no new evidence" rule was the "quo" for LG in return for the *Promega* "quid" for Mondis, without which the district court would not have proceeded with any damages retrial at all. LG Br. at 66-68. That is feeble deflection. The district court never concluded that its *Promega* concerns were obviated by, or warranted, limiting the retrial to a strict subset of the original trial evidence, and it would have been error if it had. Appx255-263.

In support for the district court's "no new evidence" rule, LG briefly cites two wholly inapposite cases involving parties' efforts to reopen discovery to find and introduce new evidence at the retrial. LG Br. p. 67 (*citing Habecker v. Clark Equip. Co.*, 36 F.3d 278, 288 n. 18 (3d Cir. 1992) and *Apple Inc. v. Samsung Electrs. Co Ltd.*, Case No. 11-CV-01846-LHK, 2016 WL 777924, at *1 (N.D. Cal. Feb. 29, 2016)); *see also Habecker v. Clark Equip. Co.*, 797 F. Supp. 381, 393 (M.D. Pa. 1992). Here, Mondis sought only the option to offer evidence originally identified in the original pretrial order but that—given the court's favorable *Daubert* ruling regarding Mondis' damages theories—it did not use at the 2019 trial.

### B. The District Court's § 285 Exceptionalism Analysis Was Erroneous.

Mondis asked the district court to find this case exceptional based on LG's conduct that supported the willfulness verdict, including LG's persistent infringement and refusal to license its televisions after licensing the same technology for its identically functioning monitors. Appx1454 (Mondis 3/7/23 motion) (citing Appx250-251). Mondis also asked the district court to find the case exceptional because of LG's egregious willful conduct in delaying and making dishonest representations during negotiations. Appx1454, citing Appx1442-1446. Mondis' opening brief laid out in detail the multitude of instances of such conduct. Mondis Br. at 16-17, 21. LG left them unanswered. The district court's view was manifestly tainted by the improper context in which it approached the question.[9]

### C. The District Court's Enhancement Analysis Was Erroneous.

LG argues that the district court's *Read* factor 2 analysis was supported by nonexistent "pure-heart" evidence of LG's reasonable beliefs of noninfringement

---

[9] LG and the district court also misapply *Octane*. Willfulness is itself sufficient to support an exceptional case finding, and there is no need to tie willfulness to litigation conduct. *SiOnyx LLC v. Hamamatsu K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020).

and invalidity of the ’180 patent. LG Br. at 73-74. But the district court did not mention this supposed evidence in its opinion (Appx514-515), and LG did not provide a single witness to testify to any invalidity or noninfringement belief. Moreover, the district court concluded that LG’s large size and financial strength did not weigh for or against enhancement under *Read* factor 4. LG Br. at 75; Appx515-516. But this Court has held that factor 4 weighs *for* enhancement where the infringer is large and financially healthy. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992) (citing cases); *see also* Mondis Br. at 58 (citing cases). The district court finding that the case was close under *Read* factor 5 was also erroneous because closeness does not turn on whether LG prevailed on collateral proceedings at the PTO for other patents, claims that were not tried, and claims that were abandoned in order to get on with litigating the ’180 after PTO success. LG is also wrong that the district court’s findings regarding *Read* factors 1, 3, 8 and 9 (LG Br. 75-76) independently warrant upholding the court’s denial of enhancement. *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1348–49 (Fed. Cir. 2011), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016); *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1573 (Fed. Cir. 1996).

Moreover, LG argues that the district court correctly applied *Halo* when it found that the 2009 Mondis-LG monitor license and LG’s reexamination attempts

in 2014 showed LG's belief that there was no infringement of any valid patent. LG Br. at 76-77. A reexamination petition, especially by an infringement defendant, does not show a belief in its success. In any event, the Supreme Court emphasized in *Halo* that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct…." *Halo*, 579 U.S. at 105. The LG reexaminations were *after* the infringement period and are irrelevant to LG's state of mind at the pertinent time. LG presented no evidence or witnesses about its state of mind when taking the 2009 monitor license, which squarely undermined the district court's conclusion that LG had a good-faith belief of noninfringement of an invalid patent.

**D. The District Court's Prejudgment Interest Analysis Was Erroneous.**

There were two errors in the district court's calculation of interest. Contrary to usual practice, the district court set the prejudgment interest rate at the Treasury Bill rate, which was near zero for much of the interest period, without compounding, which makes this an extreme outlier among Third Circuit patent cases in the last 10 years. Mondis Br. at 64 (citing cases). LG says the district court was justified in doing so because Mondis did not introduce evidence of actual borrowing costs per *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988). Such evidence is not required to support

application of the Third Circuit standard. In any case, there was such evidence in the record, namely, the [redacted] provision in the [redacted].

LG argues that Mondis ignored controlling Third Circuit law on pretrial delay but the Supreme Court's *Devex* decision, which originated in the Third Circuit, controls. Mondis Br. at 61-63, citing *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983) and *Kaufman v. Microsoft Corp.*, 34 F.4d 1360, 1374 (Fed. Cir. 2022) (quoting *Devex*). Here the district court made a clearly erroneous factual finding that Mondis self-servingly delayed suing LG without justification. Appx528-530. LG admits that the limited delay between September 2009 (monitor license) and June 2011 (Innolux trial loss) arose from both sides awaiting the Innolux result and that LG was reluctant to resume during that appeal, which ended with the 2013 Innolux settlement. LG Br. at 78. The district court had no basis whatsoever to find that Mondis was the agent of delay—at all and still less because delay served only LG and in view of the impending expiration of the patent harmed Mondis. Mondis met with LG 11 times between 2009 and 2014. C*ompare Crystal Semiconductor*, where the patentee went out of its way to avoid contacting the defendant. *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001).

## RESPONSIVE ARGUMENT TO LG'S CROSS-APPEAL

In its cross-appeal, LG challenges the district court's 2019 refusal to grant JMOL on infringement and validity, and its 2023 refusal to vacate the retrial damages award. The district court properly concluded that a reasonable jury, applying the proper burdens, could have rendered those verdicts.

## COUNTER-STATEMENT OF LG CROSS-APPEAL ISSUES

1. Whether the district court erred in denying LG's JMOL motion on written description, after concluding that LG's expert had been impeached, and in light of his admissions and teachings of the specification?

2. Whether the district court erred in denying LG's JMOL motion of non-infringement?

3. Whether the district court erred in denying LG's motion to vacate the retrial jury's $14.3 million damages verdict where there was ample evidence in the record supporting that amount?

## COUNTER-STATEMENT OF LG's CROSS-APPEAL CASE AND FACTS

LG put the procedural and factual background in its argument sections. LG Br. at 5. Where Mondis disputes LG's account, it does the same in its responsive argument sections below.

## SUMMARY OF THE ARGUMENT

I. Written Description: The district court properly concluded that a reasonable jury could have rejected LG's written description defense, a fact issue for which LG bore a clear and convincing burden. Reversal is only appropriate in an "extreme" case (*Gay v. Petsock*, 917 F.2d 768, 771 (3rd Cir. 1990)), and this is not one. The only thing extreme about this case is the district court's explicit finding that there were grounds to doubt the credibility of LG's expert, Dr. Stevenson. The jury was not required as a matter of law to conclude that he had presented clear and convincing evidence in support of invalidity. To the contrary, the jury had ample evidence from which to find support for the disputed "type" ID limitation, not least because Dr. Stevenson himself admitted during cross-examination that the specification disclosed the idea of display serial numbers, and that such numbers were understood to be able to identify display "type." Far from discharging its burden, LG's expert confirmed written description.

II. Communication Controller: The district court was right not to disturb the jury's infringement verdict. It was undisputed that the accused LG televisions implement the VESA E-DDC standard and include $I^2C$ EEPROM chips. Mr. Lamm provided a detailed explanation that such chips include a communication controller to implement the complex communications protocols set forth in the

standard. Mr. Lamm's opinion was corroborated by testing and by a representative datasheet for an $I^2C$ EEPROM. The district court was well justified in concluding that "Lamm's conclusions constitute a reasoned inference from the underlying evidence and are not speculative and conjectural." Appx225-226.

III. District Court's Denial of LG Motion to Vacate Retrial Jury's $14.3 Million Award: Given the jury's general damages verdict, there is no way to know whether the jury applied any, or if so what, certainty uplift, let alone the 200% uplift LG now attacks. There are many ways the jury could have reached a $14.3 million award without applying that or any other certainty adjustment, and accordingly, LG's appeal is without merit. In any event, as the district court found, an adjustment to accommodate the validity and infringement assumptions of *Georgia-Pacific* would have been well-supported by this Court's precedent, Mondis' evidence, and the admissions of LG's damages expert. The district court did not abuse its discretion in refusing to vacate the verdict.

## I. STANDARD OF REVIEW.

This Court reviews a denial of JMOL or a new trial under the law of the regional circuit. *Bio-Rad Labs.*, 967 F.3d at 1362-63. In the Third Circuit, a denial of JMOL is reversed "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference,

there is insufficient evidence from which a jury reasonably could find for the nonmovant." *Id.* at 1363. JMOL in favor of the party bearing the burden of proof is appropriate only in "extreme circumstances." *Gay*, 917 F.2d at 771.

With respect to the district court's denial of LG's motion for new trial on damages, this Court is bound here by the Third Circuit's abuse of discretion standard. *Vectura* , 981 F.3d at 1035.

## II. THE DISTRICT COURT DID NOT ERR IN DENYING LG'S MOTION FOR JMOL ON WRITTEN DESCRIPTION.

### A. The Written Description Standard.

The test for written description is "whether the disclosure 'conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Streck, Inc. v. Research & Diagnostic Sys., Inc*., 665 F.3d 1269, 1285 (Fed. Cir. 2012) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010)). Compliance with the written description requirement is a "question of fact" for the jury. *Ariad Pharm*., 598 F.3d at 1355. LG had the burden to prove lack of written description by clear and convincing evidence. *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1309 (Fed. Cir. 2015).

Because "the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before

. . . it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention . . . ." *LizardTech, Inc. v. Earth Res. Mapping, Inc*., 424 F.3d 1336, 1345 (Fed. Cir. 2005). The specification need not expressly recite the claimed invention *in haec verba*. *Blue Calypso, LLC v. Groupon, Inc*., 815 F.3d 1331, 1345 (Fed. Cir. 2016). Further, the level of detail required to satisfy the written description requirement "varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad Pharm*., 598 F.3d at 1351.

LG misstates the legal standard. It proceeds as if this is a complex chemical/biological genus-species case, which it is not, and relies on cases from those arts. LG Br. at 11, 17-18. For instance, LG analogizes this case to *Novozymes A/S v. DuPont Nutrition Biosciences APC*, 723 F.3d 1336, 1348-49 (Fed Cir. 2013), but the flaw with the enzyme genus claims in that case was that they merely provided a "roadmap" of extensive experimentation for others to determine the species (*id*. at 1350): that is not an issue in this case. Similarly, in *Centocor*, the claim limitation was actually disclosed in a few sentences in the specification, but again, the claim itself was merely a "wish list" of desired properties. *Centocor Ortho Biotech, Inc. v. Abbott Labs*., 636 F.3d 1341, 1350-51 (Fed. Cir. 2011). In *Rochester*, the

specification did not disclose any compounds that could be used with the claimed method, the method could not be practiced even considering the knowledge of those in the art, and there was no evidence the compound was known. *Univ. of Rochester v. G.D. Searle & Co*., 358 F.3d 916, 927-28 (Fed. Cir. 2004). These cases are far afield from the issue presented here, and the factual context matters. *See Indivior UK Ltd. v. Dr. Reddy's Labs. S.A.*, 18 F.4th 1323, 1329-1330 (Fed. Cir. 2023) ("…written description cases are intensively fact-oriented, and the cases vary …."); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991) ("… each case must be decided on its own facts. Thus, the precedential value of cases in [the written description] area is extremely limited.") (quoting *In re Driscoll*, 562 F.2d 1245, 1250 (CCPA 1977)).

LG also argues that in the face of invalidity testimony by Dr. Stevenson, Mr. Lamm was required to provide testimony in rebuttal. LG Br. at 20-21. This is incorrect. The burden is always on the challenger. "[A] jury or a court may reach a conclusion that a patent remains valid solely on the failure of the patent challenger's evidence to convincingly establish the contrary. A patent being presumed valid at birth, § 282, a patentee need submit no evidence in support of a conclusion of validity by a court or a jury." *Orthokinetics v. Safety Travel Chairs*, 806 F.2d 1565, 1570 (Fed. Cir. 1986); *see also Pfizer, Inc. v. Apotex, Inc*., 480

F.3d 1348, 1360 (Fed. Cir. 2007) ("a patentee never must submit evidence to support a conclusion by a judge or jury that a patent remains valid."). LG also implies that the burden shifted to Mondis, but that is wrong as well. *Cephalon, Inc. v. Watson Pharm., Inc*., 707 F.3d 1330, 1337-38 (Fed. Cir. 2013) (no burden shifting framework) (citations omitted); *see also St. Jude Med., Inc. v. Access Closure*, 729 F.3d 1369, 1381-82 (Fe("This burden of proof never shifts to the patentee.").

In any event, as discussed below, LG's expert himself provided factual testimony that independently showed written description, namely, that the specification disclosed the idea of display serial numbers, which were numbers enabling identification of display "type." Far from discharging its burden, LG's expert confirmed written description. At that point, Mondis was entitled to decide to leave the matter as it stood with the jury.

### B. The District Court Did Not Err in Concluding that the Verdict of No Invalidity Was Supported by the Record.

LG contends that the claim limitation "an identification number for identifying at least a type of said display unit" lacks written description. LG Br. at 10-11. The district court held to the contrary, properly rejecting LG's reliance on the impeached testimony of its expert.

### 1. The Written Description Record.

The '180 patent describes an improved display unit for receiving video signals from a video source such as a computer or cable box. Appx20284 (Lamm Tr. 284:8-18). At the time of the invention in 1993, there was a proliferation of different types of displays having different sizes, resolutions, and capabilities. Appx20285-20286 (Lamm Tr. 285:9-286:16). For instance, the specification references different display types, including LCD and CRT. Appx20323 (Lamm Tr. 323:5-14); Appx569 (4:35-36), Appx571 (8:50-55).

The specification contemplates that these different display types posed the problem of maintaining signal compatibility with a video source. Appx20286 (Lamm Tr. 286:17-22). For instance, the specification makes reference to providing a "suitable display image" to a "type of display device." Appx568 (1:41-44). The specification also refers to a multitude of possible video signals and thus potential compatibility issues. Appx20286-20287 (Lamm Tr. 286:17-287:6) ("various video signal specifications" at Appx569 (4:26-28); Appx20287 (Lamm Tr. 287:7-14) (reference to "various video signals" at Appx568 at 1:35-40); Appx20287 (Lamm Tr. 287:15-23) (reference to "not a known signal" at Appx568 at 1:56-58).

The specification provides a solution to the signal compatibility problem. Appx2087-20292 (Lamm Tr. 287:24-292:5). This solution included a display memory storing display characteristic information and display IDs that are communicated to the video source by a communication controller. *Id.*; Appx557 at FIG. 2. More broadly, the patent teaches that the memory stores all "necessary information." Appx20289 (Lamm Tr. 289:13-17).

It was undisputed that it was common knowledge in the art that different display types required different video signal formats and that it was known in the industry to use display type IDs to facilitate signal compatibility. Appx20369 (Lamm Tr. 369:2-10). Indeed, Dr. Stevenson, introduced a prior art patent (Sawdon) to show that it was known "to identify the type of display device so that you could automatically configure the computer to work with that monitor." Appx20537-20538 (Stevenson Tr. 537:6-538:15).

Dr. Stevenson testified that the specification taught the storing and sending of "identification numbers" for configuring a computer to "generate the proper signals" for a monitor. Appx20559-20560 (Stevenson Tr. 559:18-560:17). He also testified that the display IDs disclosed in the specification comprised serial numbers for identifying a particular display:

> Q. And first of all, can you remind the jury generally *how the '180 patent describes an identification number*?
>
> A. Well, if you read the *specification of the '180 patent*, you will see there's a fair amount of discussion of identification number, but *it's an identification number that uniquely identifies a particular computer monitor or display unit*. So, the identification number that's described as telling you this is exactly this particular display unit.
>
> Q. And is there anything in the early DDC, EDID standards that is *similar to the identification number described in the '180 patent*?
>
> A. Well, we've heard some discussion of it already, the *serial number*. That would be an example of a type of number that could uniquely identify a particular display unit. Right? So everything is supposed to have a unique *serial number*, and so that's a number that could be uniquely used to identify a particular display unit.

Appx20570-20571 (Stevenson Tr. 570:20-571:13). This was not an isolated slip, as Dr. Stevenson repeated his view that the ID numbers disclosed in the '180 specification comprised serial numbers.

> So that's exactly *what is being shown in … the body of the patent*, those examples we just talked about. Right? You are going to identify, *uniquely identify that display unit* so you can either send information to it or you know that the right one is hooked up. So, you know, in terms of EDID data, you know, the *serial number* would do that. But, you know *that's what's disclosed*.

Appx20615-20616 (Stevenson Tr. at 615:22-616:11) (emphasis added). *See also* Appx20614 (Stevenson Tr. at 614:14-18) (patent title says "an identification number for identifying a display unit…. So this is something like a serial number.").

During cross-examination, Dr. Stevenson then admitted that such serial numbers are able to identify display type as required by the claims.

> Q. *So what sort of thing would you consider to be evidence of the Type ID described in the claim? I think you said a serial number would do it, right?*
>
> A. *Potentially could, yeah.*

Appx20658 (Stevenson Tr. 658:3-6) (emphasis added). Indeed, he did so twice. Mondis sought reiteration that a serial number could be a type ID, and Dr. Stevenson explicitly provided confirmation:

> Q. *And you had told me before that a serial number would be a type ID, right?*
>
> A. *It could be.*

Appx20667 (Stevenson Tr. 667:6-8) (emphasis added).

Dr. Stevenson's testimony that the display serial numbers described in the specification comprised the claimed type ID was decisive. In closing, Mondis expressly pointed to these admissions as demonstrating that the written description

requirement was satisfied. Appx20879-20880 (Tr. 879:23-880:12). LG did not argue otherwise.

LG cannot ignore these critical admissions during Dr. Stevenson's cross-examination and then insist that the jury was legally required to accept his conclusion on invalidity. At the minimum, there was no clear and convincing testimony of invalidity in light of these admissions. The district court was correct to deny LG's JMOL of invalidity with or without rebuttal testimony. *See, e.g., E.I. Du Pont De Nemours & Co. v. Unifax I LLC*, 921 F.3d 1060, 1074-75 (Fed. Cir. 2019) (affirming denial of JMOL of invalidity where patentee called no rebuttal expert and the jury could have relied on admissions by defendant's expert to conclude that the patent was not invalid). *See also Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1314-15 (Fed. Cir. 2009) (affirming denial of JMOL of invalidity when jury could have relied on admissions by defendant's expert to determine that patent was not invalid); *Moba, B.V. v. Diamond Automation, Inc*., 325 F.3d 1306, 1322 (Fed. Cir. 2003) (similar).

### C. The Jury Was Free to Dismiss Dr. Stevenson's Ultimate Conclusion on Written Description for Lack of Credibility.

The district court's decision to deny JMOL was also supported by the damning finding that "[a] reasonable jury could have heard [his] testimony and

concluded that Dr. Stevenson's credibility as a witness had been impaired." Appx223 (D.E. 558 at 4).

Dr. Stevenson's testimony on the critical issue of display "type" was riddled with incredible assertions and inconsistent statements. He denied basic propositions, including that televisions, projectors, and monitors are "types" of displays. Appx20662 (Stevenson Tr. 662:2-6). He even tried to dispute that color and monochrome displays were different display types. More particularly, he denied that bits 3 and 4 identified display type even though the industry standard applicable to this case explicitly states that they identify the "Display Type" as being RGB color or monochrome. Appx20580 (Stevenson Tr. 580:13-16); Appx20333-20335 (Lamm Tr. 333:11-335:21; explaining standard); Appx16374 (MON-0509).

Dr. Stevenson's evasions on the plain meaning of display "type" culminated with his impeachment when he testified that the accused televisions did not include a display type ID. Appx20533 (Stevenson Tr. 533:8-14); Appx20580 (Stevenson Tr. 580:13-16). During cross-examination, however, he was confronted with his own test report, which reported the "display type" of the television he tested as being "RGB color" after retrieving its EDID information. Appx20664-20665

(Stevenson Tr. 664:11-665:20); Appx20668-20669 (Stevenson Tr. 668:21-669:1) (discussing Appx17865).

The impeachment of Dr. Stevenson did not end there. He also testified unequivocally that LG televisions did not include product ID codes or serial numbers. Appx20574-20575 (Stevenson Tr. 574:21-575:6): Appx20578 (Stevenson Tr. 578:11-25). Yet, his test report showed that some of the televisions did store product IDs such as "LG TV" and "GSM0001." Appx17865 (LG-297); Appx20664-20666 (Stevenson Tr. 664:15-666:24). And some also included serial numbers. Appx17865; Appx20667 (Stevenson Tr. 667:9-18). *See also infra* at III.D. (Dr. Stevenson impeached with own expert report concerning "communication controller").

Finally, the jury heard that Dr. Stevenson had failed to address, and appeared to be unaware of, the examiner interview, in which two examiners on reexamination agreed to the addition of the "type ID" limitation. Appx20554 (Stevenson Tr. 554:14-20); Appx20613-20614 (Stevenson Tr. 613:23-614:4); Appx20616 (Stevenson Tr. 616:12-21); Appx20636-20637 ((Stevenson Tr. 636:4-637:14).

In sum, Dr. Stevenson was shown to be a deeply flawed witness. The district judge heard Dr. Stevenson's testimony and concluded that the jury was entitled to find that his credibility had been "impaired."

LG seeks to brush that aside, even though such determinations are entitled to great deference, particularly where the proffering party bears the burden of proof. *See, e.g., Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374 (Fed. Cir. 1998). In *Applied*, defendant's expert testified that claims were invalid. *Id*. at 1378. As here, the patent owner saw no need to provide expert rebuttal testimony in the face of manifestly flawed testimony. *Id*. at 1379. And also as here, the district judge remarked that "the jury could have concluded that this testimony [by defendant's expert] was not credible." *Id*. at 1379. This Court affirmed "for the same reason delicately articulated by the district court." *Id*. On that basis, the Court held that "the jury had substantial evidence upon which it could conclude that [defendant] failed to prove by clear and convincing evidence [that the claims were invalid]." *Id*. at 1378.

LG argues that Dr. Stevenson's impeachment was limited to infringement alone and cannot affect his invalidity testimony. LG Br. at 20-21. This is doubly wrong. He was impeached on issues relating to both infringement and validity, including the scope and meaning of display "type." In any event, jurors are not

required to compartmentalize their views of a witness' credibility issue by issue. As is customary, the jury was instructed they could disregard any or all testimony upon a finding that credibility was lacking. Appx20897 (Tr. 897:11-13); *see Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1192 (Fed. Cir. 1998) (quoting *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 183 (Fed. Cir. 1994)) ("It is within the province of the jury to determine the credibility of a witness and the weight to be given his testimony"). Indeed, the jury was specifically instructed they could distrust "all" testimony including that "concerning other matters" if they determined the witness knowingly testified falsely. Appx20898-20899 (Tr. 898:14-899:2).

LG's case citations on impeachment bear no resemblance to this case and cannot negate the actual jury instructions on impeachment, which were given without objection. Appx20882-20883 (Tr. 882:4-883:23). LG cites *Nuvo Pharm. (Ireland) Designated Activity Co., Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1381, n.4. (Fed. Cir. 2019). LG Br. at 23. But *Nuvo* did not involve impeachment and the testimony was found to be "ambiguous." LG relies on *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334 (Fed. Cir. 2007) for the proposition that an expert's impeachments with respect to infringement "do not affect" their opinion on invalidity. LG. Br. at 22-23. There is no such holding. For three experts the

court merely observed that the cross examinations focused only on "general issues," which has nothing to do with impeachment. *Integra*, 496 F.3d at 1344. The fourth witness allegedly "changed his position" on an irrelevant collateral issue that did not form the basis of any opinion being offered, and no challenge was made to his testimony about the validity of his test results. *Id*. at 1345-46. Plainly, unchallenged test results, which are not themselves an opinion anyway, are not dependent on an alleged change of position on a non-material point. For the last witness, "no contrary testimony" was identified and so there was no impeachment. *Id*. at 1346. In contrast, Dr. Stevenson was impeached on substantive opinions he offered to the jury and his own test report, including his opinions that LG televisions do not include a type identifier or a communication controller.

### D. There Was Additional Substantial Evidence Supporting the Jury's Finding on Validity.

It was not the plaintiff's burden to produce affirmative evidence of validity or call Mr. Lamm in rebuttal. Nevertheless, the jury had additional substantial evidence supporting written description from the '180 patent itself, along with testimony by Mr. Lamm concerning the teachings of the patent and the knowledge of those in the art.

### 1. The Specification Provides Substantial Evidence of Written Description Support By Using Display IDs as Type IDs.

In addition to Dr. Stevenson's admissions, there was also written description support for a type ID based on Mr. Lamm's description of the patent and the plain words of the specification. The specification describes an embodiment where an ID number is sent from the display to a computer:

> Namely, an *ID number* is sent to the computer 1 from the display device 6 so that the computer 1 *identifies that the display device 6 having a communication function is connected* and the computer 1 compares the ID number with the ID number registered in the computer 1. When the corresponding ID number is registered, the computer 1 controls the display device 6 by a predetermined control instruction.

Appx570 (5:62-6:2) (emphasis added). Mr. Lamm presented this passage to the jury and explained that the communication function comprised a "video format the display is capable of receiving." Appx20290-20291 (Lamm Tr. 290:5-291:4). This display ID number plainly identifies a display type in accord with the ordinary meaning of the word "*type*," because the ID distinguishes between two groups of displays based on their common characteristics, *i.e.* those that support a

"communication function" (video format) and those that do not.[10] It does not require a degree in electrical engineering to understand that different video formats, like monochrome or color, or VGA, denote different types of displays. Therefore, even though the ID is not expressly labelled a "type" ID, that is the function it is described as performing in accordance with the lay meaning of the passage and the term "type." *See, e.g.*, *Inphi Corp. v. Netlist, Inc*., 805 F.3d 1350, 1354 (Fed. Cir. 2015) ("Substantial evidence supports a finding that the specification satisfies the written description requirement when 'the essence of the original disclosure' conveys the necessary information—"regardless of how it" conveys such information….'") (citation omitted).

Given the specification's description of a display ID being used to differentiate classes of displays with different capabilities, the jury was entitled to draw the reasonable inference that a display type ID was disclosed. This is particularly true given that display type IDs are not complex technology and were

---

[10] The district court instructed the jury that the "type ID" limitation possessed its plain and ordinary meaning. Appx20901 (Tr. 901:2-23). *See Action Techs., Inc. v. Novell Sys., Inc*., 155 F.3d 567, *5 (Fed. Cir. 1998) (unpub.) ("In our view, 'type' should be given its ordinary meaning, which is 'a kind, class, or group having distinguishing characteristics in common.' WEBSTER'S NEW WORLD DICTIONARY 1446 (3d College ed.1994).").

well known in the art for solving the same signal compatibility problem being addressed by the ’180 patent. Appx20369 (Lamm Tr. 369:8-10); *see also* Appx20538 (Stevenson Tr.538:4-15) (known in prior art to “identify the type of display device so that you could automatically configure the computer to work with that monitor.”). *See Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (“a patentee may rely on information that is ‘well-known in the art’ for purposes of meeting the written description requirement.”) (citation omitted); *Hologic, Inc. v. Smith & Nephew, Inc*., 884 F.3d 1357, 1361 (Fed. Cir. 2018) (“a lower level of detail is required to satisfy the written description requirement” when field of invention is a predictable art).

LG objects that some of Mondis’ arguments allegedly were not raised below. LG Br. at 25-28. Mondis is the prevailing party having won the jury verdict and defeated LG’s JMOL. As appellee on this issue, Mondis can defend “on any ground that is supported by the record.” *Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013). LG’s case is inapposite because the appellant had lost below and failed to raise certain arguments. *In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (2020).

### 2. The Prosecution History Demonstrates That the Type ID Was Properly Added.

The disputed type ID limitation was added to overcome a prior art rejection as the result of a specific negotiation between the applicant and two examiners during an in-person interview where they all "agree[d]" to this amendment. Appx15102; Appx20636-20638 (Stevenson Tr. 636:2-638:13). An amendment under such scrutinizing circumstances is highly likely to be proper. *See Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech., Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008) (where a claim amendment is allowed without objection, it "is entitled to an especially weighty presumption of correctness.").

LG asserts that prior to the claim being amended to add "type" to the identification number limitation, the claim was limited to an ID number that uniquely identified a specific display and that the amendment fundamentally changed the claim's scope and meaning. LG Br. at 14-18. While the amendment narrowed the claim to require identification of display type, the amendment did not exclude unique identifiers (*i.e.*, serial numbers) from performing that function. Indeed, at least the embodiment at Appx570 (5:62-6:4) uses a display ID to both identify a "specific display device" as well as to differentiate types of displays as discussed above. *Supra* II.D.1; LG Br. at 27. Moreover, this embodiment is fully

consistent with Dr. Stevenson's testimony that a serial number was known to also function as a type ID.

## III. THE JURY PROPERLY FOUND INFRINGEMENT GIVEN THE EVIDENCE OF A COMMUNICATION CONTROLLER.

There was substantial evidence in the record to support the infringement verdict based on the testimony of Mr. Lamm and the admissions of Dr. Stevenson.

### A. Mr. Lamm's Opinion Was Well-Supported by LG's Implementation of the VESA E-DDC Standard.

The accused LG televisions include at least one HDMI port that requires implementation of the VESA Enhanced Display Data Channel (E-DDC) standard. Appx20269 (Tr. 269:4-8); Appx20296-20297 (Lamm Tr. 296:13-297:15); LG Br. at 30. The E-DDC standard describes a protocol known as "DDC2B" that is necessarily implemented in LG's televisions so they can communicate their stored EDID data to a video source such as a cable box. Appx20343 (Lamm Tr. 343:3-23); Appx20354 (Lamm Tr. 354:13-22). DDC2B is based upon the Philips $I^2C$ protocol. Appx20344 (Lamm Tr. 344:3-21); Appx20676 (676:2-4).

At trial, Mr. Lamm used Figure 3.2 of the VESA E-DDC standard to explain in detail the communications functions that must be performed by the accused televisions to implement the DDC2B/$I^2C$ protocol:




**Figure 3.2 - DDC2B Sequential Read (Segment 0 only)**

Appx16341; Appx20345-52 (Lamm Tr. 345:9-352:21). Mr. Lamm then opined that these communications functions necessarily require a communications controller in the display:

> Q. Mr. Lamm, have you formed an opinion as to whether the VESA E-DDC standard *requires* implementation of *the bidirectional controller at the display* in order to execute DDC2B protocols?
>
> A. *Yes. It does*. And what I need to do is describe what a communication controller is versus just a bare interface, and our basic interface. You know, we've gone through a pretty exhausting detail about the actual communication protocol here, and *the level of complexity* of the protocol and some of the features in it are things that elevate this from being a basic interface to being something that *requires a communication controller*. And just to summarize kind of some of the things we've seen is that the display, or the communications controller in the display, [1] has to be able to recognize the start event initiated by the video source, [2] has to generate acknowledgement signals, [3] it has to retrieve the EDID data from its memory and code it for serial transmission. [4] It has to receive and interpret ACK signals from the

> video source. [5] It has to recognize the stop events to free the bus. And probably most importantly [6] it has to decode and parse this device address. *And so all of these things combined together influence my opinion that this is a communications controller to have to do all those functions*.

Appx20353-20354 (Lamm Tr. 353:3-354:5) (numbering added); *see also* Appx20482 (Lamm Tr. 482:13-22). Mr. Lamm also performed testing on several LG televisions to corroborate that they implemented the VESA and HDMI standards, which include the DDC2B/$I^2C$ protocol. Appx20315 (Lamm Tr. 315:3-23); Appx20364-20365 (Lamm Tr. 364:18-365:4). He concluded that the accused televisions satisfied the communication controller requirement. Appx20354 (Lamm Tr. 354:6-22); 20359 (Lamm Tr. 359:4-21). Contrary to LG, Mr. Lamm's opinion was anything but speculative and conclusory. By any objective measure, Mr. Lamm's opinion was well-supported, and its basis clearly explained. LG simply disagrees with it.

LG relies on *Brigham* for the proposition that "Lamm had to present corroborating evidence." LG Br. at 35 (citing *Brigham & Women's Hosp., Inc. v. Perrigo Co*., 761 F. App'x 995, 1005 (Fed. Cir. 2019)). But in *Brigham* the issue was that in the absence of any clinical data, the expert/inventor testified that he *personally* experienced "immediate relief" in accordance with the claim when he

took the accused medication. *Brigham* did not set forth a blanket rule requiring corroborating evidence for an expert's well-reasoned opinions. In any event, here there is corroboration in the form of Mr. Lamm's testing and the Microchip $I^2C$ EEPROM datasheet.

LG also implies that failing to introduce "direct" evidence renders Mr. Lamm's opinions deficient. LG Br. at 29-30. Yet, Mondis presented direct evidence of testing confirming the accused televisions implemented the VESA standard. In any case, the jury was properly instructed that, "circumstantial evidence is of no less value than direct evidence." Appx20894 (Tr. 894:6-10).

### B. The Jury Found Mr. Lamm to be More Credible Than Dr. Stevenson.

Trial presented a routine dispute between infringement experts. Thus, there is no basis to disturb the verdict. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1368-69 (Fed. Cir. 2018) (affirming denial of JMOL of no infringement because the jury was entitled to credit plaintiff's expert on the issue). Dr. Stevenson never disputed that the E-DDC standard requires, or that the accused televisions were capable of performing, communications functions [1]-[6] identified by Mr. Lamm. Nor did he offer any rebuttal to Mr. Lamm's opinion that

these communications functions collectively require a communication controller. Appx20607-20613 (Tr. 607:22-613:1)

The jury was entitled to agree with Mr. Lamm. He had 42 years of display experience, including in the design of displays and display controllers. Appx20272 (Lamm Tr. 272:1-6); Appx20274-20275 (Lamm Tr. 274:11-275:1). He served on VESA's board of directors and worked on the VESA standards. Appx20280 (Lamm Tr. 280:8-19); Appx20298-99 (Lamm Tr. 298:20-299:4); Appx20304 (Lamm Tr. 304:16-19). There was no error in the district's determination that "Lamm's conclusions constitute a reasoned inference from underlying evidence and are not speculative and conjectural." Appx225-226.

### C. The EEPROM Datasheet Corroborated Mr. Lamm.

Although judgment can be affirmed solely based upon Mr. Lamm's analysis of the VESA E-DDC standard, Mr. Lamm also discussed the structure and operation of the chips in the accused televisions that include the communication controller. More particularly, Mr. Lamm testified that the accused televisions include integrated circuit memory chips known as EEPROMs that store the display's EDID data. Appx20268-20269 (Lamm Tr. 268:21-269:12); Appx20319 (Lamm Tr. 319:6-13). Mr. Lamm explained that these EEPROMs include an $I^2C$ bus, and therefore possess an embedded communication controller to implement

the DDC2B/I$^2$C protocol. Appx20354-20355 (Lamm Tr. 354:23-355:16); Appx20359 (Lamm Tr. 359:4-12); Appx20483 (Lamm Tr. 483:3-9). He used a demonstrative LG circuit board and a slide to show the jury where these EEPROMs were located. Appx20316 (Lamm Tr. 316:3-23); Appx20318-20319 (Lamm Tr. 318:16-319:18); LG Br. at 31 (Lamm slide showing EDID EEPROMs with "comm. Controller").

Importantly, the EEPROMs in the accused televisions are commodity chips having the generic industry part number "24C02." Appx20355-20356 (Lamm Tr. 355:17-356:10); Appx20483-20484 (Lamm Tr. 483:17-484:3). Mr. Lamm showed the jury a figure from a datasheet for such a 24C02 "I$^2$C Serial EEPROM." Appx16393 (MON-0511).



Mr. Lamm explained that the "I/O Control Logic" implements the DDC2B/$I^2C$ protocol and comprises the communications controller. Appx20356-20357 (Lamm Tr. 356:23-357:20); Appx20476 (Tr. 476:1-12).

LG attempts to denigrate this evidence because the datasheet was published by Microchip, and Mr. Lamm admitted he was unable to confirm whether the particular 24C02 chips used in the accused televisions were made by Microchip, as opposed to another vendor who makes the same part number. LG Br. at 37-38. LG's criticism misses the mark. Mr. Lamm testified he was familiar with the operation of EEPROMs such as those in the accused products. Appx20355 (Lamm Tr. 355:17-19). He "looked at specifications for all the different manufacturers that I could identify, and there were quite a few …" Appx20356 (Lamm Tr. 356:7-9). He also explained that 24C02 EEPROMs "are all compatible with each other" (Appx20355-20356 (Lamm Tr. 355:22-356:1)), and that "internally they operate in a similar manner." Appx20356 (Lamm Tr. 356:7-10). Accordingly, he testified that the Microchip datasheet was "representative" of the chips in the accused products. Appx20358-20359 (Lamm Tr. 358:25-359:3); Appx20483-20484 (Lamm Tr. 483:17-484:10). Dr. Stevenson said nothing about the Microchip datasheet or its "I/O Control Logic." Appx20607-20613 (Stevenson Tr. 607:22-

613:1). Finally, despite its present contention that the Microchip datasheet is irrelevant, LG made no objection to its introduction at trial.

### D. The Jury Could Have Found a Communication Controller Based Upon Dr. Stevenson's Own Admissions.

Dr. Stevenson admitted that all accused LG televisions include at least one I$^2$C EEPROM to store the display's EDID data. Appx20643 (Stevenson Tr. 643:14-17). He further admitted that "there is always at least one" communication controller to implement the I$^2$C protocol. Appx20681 (Stevenson Tr. 681:7-9). Although he concluded that there was no communication controller in the televisions, he was impeached with his expert invalidity report where he had opined that I$^2$C EEPROMs, which comprise prior art, include communication controllers to implement the I$^2$C protocol.

> Q. Could you please read paragraph 462 into the record for us?
>
> A. Thus, in my opinion, a POSITA, that stands for person of ordinary skill in the art, would have understood that an I$^2$C *EEPROM* discloses an EEPROM memory that *implements the I$^2$C communications protocol* and allows the EEPROM to bidirectionally communicate with any other devices that are connected to the I$^2$C bus.
>
> Q. And then. Finally, please read 463.
>
> A. *Accordingly*, in my opinion, *a POSITA would have understood* the I$^2$C bus – I$^2$C bus— excuse me, I$^2$C *EEPROM* individually or collectively disclose the use of

> *a communication controller* capable of bidirectionally communicating with a video source.

Appx20678 (Tr. 678:12-24); *see also* Appx20674 (Tr. 674:3-19) (admitting his report stated that figure from $I^2C$ EEPROM specification "corresponded to a communication controller"). It was within the jury's discretion to credit Dr. Stevenson's admissions that a POSITA would consider an $I^2C$ EEPROM, like those in the accused products, to include a communication controller to implement the $I^2C$ communications protocol.

LG attempts to take the sting out of these damaging admissions by citing testimony from Dr. Stevenson that these statements from his report were allegedly about a "particular piece of prior art," and that his report was supposedly applying "Mr. Lamm's definition" of a communication controller. LG Br. at 40 (citing Appx20675 (Tr. 675:14-15); Appx20678 (Tr. 678:4-11)). But Dr. Stevenson's report expressly states that a "*POSITA*," and not just Mr. Lamm, would have understood an $I^2C$ EEPROM to include a communication controller. Appx20678 (Tr. 678:12-24). The jury was free to disregard these excuses and credit the unequivocal admissions from Dr. Stevenson's report.

*** *** ***

In summary, there is substantial evidence from both Mr. Lamm and Dr. Stevenson to support the jury's infringement finding. The denial of LG's JMOL should be affirmed.

## IV. THE DISTRICT COURT DID NOT ERR IN DENYING LG'S MOTION TO VACATE THE RETRIAL $14.3 MILLION DAMAGES AWARD.

LG argues the $14.3 million retrial damages verdict lacks substantial evidence. LG concedes that the jury could have awarded $4.7 million, but assumes the jury improperly trebled that amount. LG Br. at 43. The district court, however, correctly observed that "given the 'black box' nature of the jury verdict, we have no idea how the jury arrived at the damages verdict and whether the jury used any uplift multiplier; LG simply assumes that the jury must have." Appx541. In fact, there are many ways the jury could have reached the $0.75 per unit effective royalty it rendered, with or without an certainty adjustment.[11] LG Br. at 42-43. There is no basis to disturb the district court's affirmance of the award.

---

[11] As noted below, given the black-box verdict, Mondis does not concede LG's asserted $4.7 million x 3 calculation.

### A. There is No Error in the District Court's Conclusion That the Jury Could Have Awarded $14.3 Million.

The parties jointly submitted, and the jury used, a verdict form that asked only: "What sum of money, if paid today, have Plaintiffs proven to be more likely than not to compensate Plaintiffs for LG's infringement?" Appx506 (D.E. 764). Because there is no way to know how the jury came to its damages number, the district court was required to deny LG's motion if the award could be supported by at least one hypothetical damages calculation based on the evidence. *Riseman v. Advanta Corp.*, 39 Fed. Appx. 761, 764 (3d Cir. 2002) (affirming award where it could have been supported by at least one hypothetical calculation); *Unisplay, S.A. v. Am. Elect. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (holding jury's award need not be one the parties advocated but "must be within the range encompassed by the record as a whole."). "Where there is a black box jury verdict, as is the case here, we presume the jury resolved underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if supported by substantial evidence." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309-10 (Fed. Cir. 2019) (quoting *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017)).

Because $14.3 million divided by the 19 million infringing televisions yields $0.75 per television, any method the jury could have used to reach that $0.75 would fatally undermine LG's challenge. There were several.

The jury could have started with an LG television base price of $220 per unit as per Mr. Hansen's "excess sales" methodology, which he testified was an *already apportioned* base, Appx30215-30217 (Hansen Tr. 215:18-217:7) and then applied a 0.25% family rate to get to $0.55 cents per unit. It also could have started with the [redacted]/unit from the [redacted] television agreement (Appx30162 (Hansen Tr. 162:7-16)), or the $0.70/unit from the Hon Hai television agreement, which had an [redacted] of the '180 patent (Appx30124-30125 (Spiro Tr. 124:21-125:2)), Appx30195 (Hansen Tr. 195:15-21). From there, the jury would consider how to adjust the $0.55 - $0.70 starting rate to account in the hypothetical negotiation for: (1) the uncontested testimony that the '180 patent was the most important in the family (Appx30076-30080 (Lamm Tr. 76:23-80:1)); and that (2) LG made far more use of the technology in LG televisions, which had 3.6x the number of infringing ports than LG monitors under the parties' earlier license. Appx30076 (Lamm Tr. 76:9-22). The jury was also entitled to consider whether to adjust for *Georgia-Pacific* patent certainties. A reasonable jury could have balanced these factors and adjusted the rate to the $0.75

per television implicit in the verdict. LG's blanket charge that the jury's award constituted an indefensible 2x uplift is untenable.

Indeed, the jury could have reached its $14.3 million verdict without *any* certainty adjustment, as the district court acknowledged. Appx541. LG posits that the jury started with a $500 television price and used a 0.05% royalty rate, dividing the 0.25% standard rate by five licensed family patents. The jury was not required to accept LG's and Mr. Hansen's divide-by-5 approach; given the uncontested evidence that the '180 patent was the most important family patent, it could have used a different divisor or adjustment. The mid-point between those 0.05% and 0.25% rates is 0.15%, or $500 ASP x 19,049,978 televisions x 0.15% = $14,287,483, which rounds to $14,300,000, with no certainty adjustment at all.

These are all plausible paths the jury could have taken. LG cannot show that its calculus is other than speculation. LG's charge that the jury's award constituted an indefensible 2x uplift is untenable.

### B. The Record Contained Sufficient Evidence to Support an Uncertainty Adjustment.

There was substantial evidence that the reference licenses reflected a discount for real-world uncertainty of infringement and validity and that an upward

adjustment was necessary to reflect certainty in the *Georgia-Pacific* hypothetical negotiation.

### 1. There is Legal Support for an Uncertainty Adjustment.

LG contends that the uncertainty adjustment has no legal support but concedes that the district court's 2019 opinion cited *Spectralytics, Inc. v. Cordis Corp*, 649 F.3d 1336, 1347 (Fed. Cir. 2011) and *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369 (Fed. Cir. 2017), which recognized the uncertainty discount. LG Br. at 43-44. LG dismisses the decisions as "merely recogniz[ing] that litigation-related uncertainty could lower a patent's value." LG Br. at 44 (citing Appx243-244). That *is* the point. Just as litigation-related uncertainty about infringement and validity can lower a patent's value, the removal of those uncertainties in the hypothetical negotiation can justify a corresponding upward adjustment. LG's claim that neither case adopted a "damages multiplier" nomenclature is just semantics. The principle of litigation uncertainty adjustment follows from *Georgia-Pacific* itself,[12] is inherent in *Spectralytics* and *Prism Techs*, and is reflected generally in the Court's jurisprudence. *Spectralytics*, 649 F.3d at

[12] *Lucent Techs.*. 580 F.3d 1301 at 1324-25 (the hypothetical negotiation approach to calculating a reasonable royalty, derived from *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp 1116, 1120 (S.D.N.Y. 1970), "assumes that the asserted patent claims are valid and infringed.").

1347 (recognizing that patent-in-suit's value in prior asset sale, when proving its validity would have required "millions of dollars … to launch lengthy and risky litigation… would have reflected a very deep discount" for that uncertainty); *Prism Techs.*, 849 F.3d at 1369 ("[T]he hypothetical negotiation rubric assumes that the asserted patents are valid and infringed. [] [A] settlement reached after a determination of liability (though subject to appeal) is particularly reliable as evidence of value.").

Indeed, Mr. Hansen agreed that the principle of an uncertainty discount was valid and was for the jury to determine. Appx21230-21232 (Hansen Tr. 1230:2-1232:17); Appx30176-30177 (Hansen Tr. 176:8-177:14). While LG now asserts that evidence is irrelevant, Hansen's admissions are plainly admissible under F.R.E. 401 to show that the uncertainty uplift is something that recognized experts apply. That Hansen applied the adjustment when representing a plaintiff in another case, but not for LG, went to his credibility.

LG attacks the district court's reliance on Mr. Hansen's *Varian* testimony (Appx542-543) as "untethered to the [Mondis] patent-in-suit…." LG Br. at 48-50. That testimony's relevance was not technical comparability, but was solely to impeach Mr. Hansen, who made the uncertainty adjustment there but refused to do so here. Appx542-543.

### 2. There is Record Support for an Uncertainty Adjustment.

There was sufficient evidence in the record from which the jury could have concluded an uncertainty adjustment was appropriate for the pre-litigation licenses.

As explained in Mondis' opening brief (at 11-16), the reference licenses arose from real-world negotiations that avoided or settled litigation. Their royalties reflected the product of a pre-litigation rate and a licensed product's sale price. The pre-litigation rate was explicitly discounted during negotiations to reflect the inherent uncertainties of validity and infringement, uncertainties that cannot be resolved without litigation. Appx20970-20975 (Spiro Tr. 970:22-975:18); Appx30108-30113 (Spiro Tr. 108:2-113:16); Appx30124 (Spiro Tr. 124:13-15).

By contrast, the *Georgia-Pacific* hypothetical negotiation is assessed under the assumption of validity and infringement. The "pre-litigation" rate in the real-world negotiation is the uncertainty-discounted rate that needs to be increased to establish hypothetical negotiation comparability in litigation. *See* Appx21003-21004 (Spiro Tr. 1003:15-1004:4); Appx21004-21005 (Spiro Tr. 1004:25-1005:23); Appx21008 (Spiro Tr. 1008:14-19); Appx30108-30113 (Spiro Tr. 108:2-113:16); Appx17122-17124. In particular, Mr. Spiro testified that he discussed the

uncertainty discount with LG in negotiating the 2009 monitor license without contradiction from any LG witness. Appx30108-30113 (Spiro Tr. 108:15-113:16).

LG tries to avoid this evidence by likening the case to this Court's *Omega* and *Finjan* decisions, neither of which is apposite. LG Br. at 44-45. In *Omega*, this Court held that Omega could not "merely [rely] on its internal 'policy' without regard to comparability[.]" *Omega*, 13 F.4th at 1379. In *Finjan*, the Court held that the plaintiff's $8-per-user royalty rate was unsupported by substantial evidence, where the plaintiff had never used or proposed the rate to anyone, and the plaintiff's fact witness had simply identified $8 as a hypothetical negotiation "starting point" based on an 8%-to-16% rate from another lawsuit involving patents that were economically and technically incomparable to the patent-in-suit. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311-12 (Fed. Cir. 2018). Similarly, in *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29-30 (Fed. Cir. 2012), the expert had rejected a royalty proposal as inaccurate but then contradictorily relied on that rejected number to gin up an artificially high royalty rate. None of these cases presented a corpus of evidence like in this case, with [redacted] reference licenses, including one with the defendant.

LG also attacks the district court's treatment of the Innolux evidence. That evidence was correctly admitted, and the judgment stands with or without it.

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1284 (Fed. Cir. 2011) (any error in evidentiary ruling was harmless under Third Circuit standard). In any event, the relevance of Innolux is not the verdict but the post-trial settlement agreement between Mondis and Innolux. As the district court acknowledged, this agreement fully adopted the 0.75% verdict rate for the '180 and two other DDC/2B patents (three times the standard 0.25% pre-litigation rate) (Appx542) and specifically refutes LG's contention that no licensee ever accepted or paid Mondis' stated post-litigation rate. LG contends that the agreement was not an exhibit so it was not in evidence, but that is wrong. Messrs. Spiro and Hansen testified about its terms, including that it incorporated the jury's 0.75% television royalty rate for the '180 and two DDC/2B siblings without discount. Appx20989-20990 (Spiro Tr. 989:17-990:19); Appx30125-30126 (Spiro Tr. 125:5-126:12); Appx30143 (Spiro Tr. 143:12-14); Appx21232-21235 (Hansen Tr. 1232:18-1233:6, 1234:16-1235:6); Appx30174 (Hansen Tr. 174:8-20). Contrary to LG, there is no per se rule barring such agreements in a reasonable royalty analysis. *Prism Techs.*, 849 F.3d at 1369 ("a settlement reached after a determination of liability (though subject to appeal) is particularly reliable as evidence of value.").

*** *** ***

The district court did not abuse its discretion in upholding the jury's verdict. LG's speculative calculations are not evidence, and a jury was permitted to adjust negotiated license rates to reflect certainty. LG concedes that a $4.7 million award would be supported and its argument that the jury lacked evidentiary support for a higher award is meritless.

## CONCLUSION

For the reasons above, the Court should: (1) reverse the district court's grant of a new trial and reinstate the jury's $45 million verdict; (2) remand to the district court to review Mondis' entitlement to enhanced damages and fees under §§ 284 and 285; (3) remand for the recalculation of interest at prime compounded quarterly from April 2, 2009; and alternatively (4) if in light of LG's cross-appeal or otherwise this Court orders a third damages trial, then Mondis requests this Court to order that Mondis may submit its apportionment theory to the jury and that the trial will not be conducted under the "no new evidence" rule.

Dated: March 12, 2024

Respectfully submitted,

/s/ Martin J. Black

Martin J. Black
Jeffrey S. Edwards
Brian M. Goldberg
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Jeffrey B. Plies
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000

*Attorneys for Plaintiffs-Appellants Mondis Technology Ltd., Hitachi Maxell, Ltd., n/k/a Maxell Holdings, Ltd., and Maxell, Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2024, Plaintiffs-Appellants' Responsive/Reply Brief was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

Dated: March 12, 2024

Respectfully submitted,

/s/ Martin J. Black

Martin J. Black
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a). This brief contains 13,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word version 15.0.5197.1000 in 14-point Times New Roman.

Dated: March 12, 2024

Respectfully submitted,

/s/ Martin J. Black

Martin J. Black
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000